UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
DONEEA KINRED,                                                   :
                                                                 :
                         Plaintiff,              :       **ORDER REMANDING CASE**
                                                                 :       **FOR FURTHER**
     -against-                                                 :       **PROCEEDINGS**
                                                                 :
MICHAEL J. ASTRUE,                                               :       07 Civ. 9232 (AKH)
Commissioner of Social Security,                                 :
                                                                 :
                         Defendant.              :
---------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        The Plaintiff, Doneea Kinred, brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security ("the Commissioner") that Plaintiff was not disabled as of December 8, 2003. The parties have filed cross-motions for judgment on the pleadings pursuant to Federal Rules of Civil Procedure Rule 12(c). For the reasons stated below, I hereby remand the case to the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g) for further findings.

*I. Background*

        Plaintiff Doneea Kinred was born on June 7, 1985. At a hearing before Administrative Law Judge ("ALJ") Lemoine, she testified that she resided with her mother in a trailer. In November of 1992, Plaintiff was diagnosed with Cyclic Neutropenia.[1] This caused her to suffer musculoskeletal pain throughout her body, particularly affecting her when she

---

[1] " Neutropenia is a reduction in the blood neutrophil (granulocyte) count, often leading to increased susceptibility to bacterial and fungal infections. It is also known as granulocytopenia or agranulocytosis. A normal neutrophil count is above 1200-1500 per microliter, depending on the individual's race. An individual is considered to have a mild risk of infection where the count is 1000-1500, to have a moderate risk of infection when the count is 500-1000, and to have a severe risk of infection when the count is under 500. The Merck Manual 931 (17th ed. 1999)." Def.'s Mot. For J. on the Pleadings 3. Plaintiff's reported neutrophil percentages do not comport with the Merck definition of Neutropenia. On August 1, 2008, I issued an order directing plaintiff to submit medical records conforming to the Merck definition of Neutropenia by August 22, 2008. Plaintiff did not comply with that order.

walked.  As a result, she ceased attending conventional school and began home schooling around the fourth grade.  She also stated that she has since received a high school equivalency diploma.

When Plaintiff was seven years old, her mother applied for Supplemental Security Income ("SSI benefits") under 42 U.S.C. § 1381 ("the Act") on plaintiff's behalf.  ALJ Michael Freeman granted Plaintiff SSI benefits on April 6, 1995.  Subsequently, the Commissioner reviewed Plaintiff's claims in 1997 and 2001 and continued her SSI benefits.  Her benefits were based on chronic cyclic neutropenia and chronic musculoskeletal pain.

*A. Administrative Proceedings*

Plaintiff reached age eighteen on June 7, 2003.  As a result, the Commissioner reviewed her claim to determine whether she met the adult standard for disability established by the Act.  The Commissioner determined that she did not.  On December 9, 2003, the Commissioner notified the Plaintiff that her SSI benefits would cease after February 2004.  Consequently, Plaintiff requested a hearing before an ALJ.  A hearing was held on March 1, 2006, before ALJ Brian Lemoine.

Plaintiff testified on her own behalf at this hearing.  She stated that she suffers from cyclic neutropenia, Raynaud's Syndrome,[2] migraines, and flat feet. She also stated that she experiences daily pain.  She testified that she has her driver's license and can care for her personal hygiene and some housework.  She also stated that she is able to drive herself to the store or doctor's appointments.  Finally, she testified that she has some friends that she met primarily through her church, but that her main social happenings consist of friends visiting her

---

[2] "Raynaud's syndrome is vasospasm of parts of the hand in response to cold or emotional stress, causing reversible discomfort and color changes (pallor, cyanosis, erythema, or a combination) in one or more digits. Occasionally, other acral parts (e.g., nose, tongue) are affected. The disorder may be primary or secondary. Diagnosis is clinical; testing focuses on distinguishing primary from secondary disease. Treatment of uncomplicated cases includes avoidance of cold, biofeedback, smoking cessation, and, as needed, vasodilating Ca channel blockers (e.g., nifedipine) or prazosin." The Merck Manuals Online, http://www.merck.com/ (last visited July 17, 2008).

while she is in bed.  Plaintiff's mother, Anna Kinred, also testified at the hearing regarding plaintiff's limitations, frequent doctor visits and the assistance plaintiff needs in driving and performing other daily tasks.

On March 16, 2006, ALJ Lemoine issued a decision finding that Plaintiff was not disabled as an adult, and that her disability had ceased as of December 8, 2003.  He ruled that Plaintiff did not suffer from "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1" and that Plaintiff has the "residual functional capacity to perform light work (20 CFR §416.967(b))." (Pl.'s Compl. App. A).  Finally, he held that "there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR §416.960(c) and 416.966)."  Id.

Plaintiff requested that the Appeals Council review this decision.  The Appeals Council denied this request on August 30, 2007.  Plaintiff now requests that this court review the Commissioner's decision. See 42 U.S.C. § 405(g).

### B. Medical Evidence

*Overview*

To support her claim, plaintiff submitted medical records for the time period of May 8, 2000 through September 2006.  These records show that she saw at least eight physicians from May 8, 2000 through January 13, 2006.  Plaintiff also submitted evidence to the Appeals Counsel after the ALJ reached his final decision covering the period from May 2005 to September 2006.  This evidence shows that Plaintiff saw two different physicians during that period.  Between May 8, 2000 and September 2006, Plaintiff underwent seven Magnetic Resonance Imaging Procedures ("MRI") and had several x-rays taken.  Plaintiff also underwent approximately seven blood tests during this time.

*1. Diagnoses*

During this time, Plaintiff complained primarily of migraine headaches; body aches, particularly in her back; and persistent head and sinus infections. Prior to age eighteen, Plaintiff was diagnosed with diffuse body aches, possible fibromyalgia[3] or autoerythrocyte sensitivity[4], cyclic neutropenia, migraine headaches, mild intermittent bronchial asthma, and adjustment disorder,[5] and depressive disorder. Between September 2001 and November 2002, Plaintiff visited Dr. Damon DelBello, who diagnosed her with mild scoliosis.[6] In July 2002, blood tests indicated that she suffered from anemia.

On November 20, 2003, after reaching the age of eighteen, plaintiff saw Dr. Alvarez at the request of the Commissioner. He diagnosed Plaintiff with the following conditions: (1) history of cyclic neutropenia; (2) history of asthma; (3) history of allergic rhinitis[7] and sinusitis; (4) history of migraine headaches; (5) history of plantar fasciitis in both feet;[8] (6) history of scoliosis in the back; (7) history of lactose intolerance, and (8) history of spontaneous

---

[3] "Fibromyalgia is a common nonarticular disorder of unknown cause characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues. Diagnosis is clinical. Treatment includes exercise, local heat, and drugs for pain and sleep." The Merck Manuals Online, http://www.merck.com/ (last visited July 17, 2008).

[4] "Autoerythrocyte sensitization is a rare disorder affecting women. It is characterized by local pain and burning preceding painful ecchymoses that occur primarily on the extremities." The Merck Manuals Online, http://www.merck.com/ (last visited July 17, 2008)

[5] Adjustment disorders are "a group of mental and behavioral disorders in which the development of symptoms is related to the presence of some environmental stressor or life event and is expected to remit when the stress ceases." Webmd, Steadman's Medical Dictionary, http://dictionary.webmd.com/ (last visited July 23, 2008).

[6] Scoliosis is an "abnormal lateral and rotational curvature of the vertebral column." Webmd, Steadman's Medical Dictionary, http://dictionary. webmd.com/ (last visited July 23, 2008).

[7] "Allergic rhinitis is seasonal or perennial itching, sneezing, rhinorrhea, nasal congestion, and sometimes conjunctivitis, caused by exposure to pollens or other allergens. Diagnosis is by history and skin testing. Treatment is with a combination of antihistamines, decongestants, nasal corticosteroids, and, for severe, refractory cases, desensitization." The Merck Manuals Online, http://www.merck.com/ (last visited July 17, 2008).

[8] "Plantar fasciitis is pain at the site of the attachment of the plantar fascia and the calcaneus, with or without accompanying pain along the medial border of the plantar fascia. Diagnosis is mainly clinical. Treatment involves calf muscle and plantar soft-tissue foot–stretching exercises, night splints, and orthotics." The Merck Manuals Online, http://www.merck.com/ (last visited July 17, 2008).

painful bruises.  Dr. Alvarez stated that plaintiff's prognosis was "good to fair", and opined that plaintiff had mild to moderate restrictions in walking, lifting, squatting and kneeling because of pain in the feet, knees and shoulders, and that she should avoid smoke, dust, and other known respiratory irritants due to a history of asthma.

On February 11, 2004, a report furnished to the Social Security Administration by Dr. Paulo Ampil stated that Plaintiff suffered from the following conditions: (1) chronic sinusitis; (2) allergic rhinitis; (3) contusion of the coccyx; (4) rectal bleeding; and (5) chronic anemia and neutropenia.  Dr. Ampil reported that plaintiff had limitations in her ability to lift and carry, stand and walk, sit and push or pull.  In May 2004, Dr. Ampil was asked to clarify his opinion. In this supplemental report, he stated that plaintiff's complaints of pain were mostly subjective, and agreed that many of plaintiff's limitations were due to a coccyx contusion, the result of a car accident, and would therefore be shortlived.

In May 2005, Dr. Mark Bele diagnosed Plaintiff with arthralgia[9] and livedo reticularis[10] with frequent infections and migraine headaches.  In October 2005, Dr. Bele assessed that plaintiff suffered from chronic joint pain, multiple sites; Raynaud's Syndrome, stable with no signs of systemic disease; and chronic migraine headaches.  In June 2005, Dr. Bele diagnosed plaintiff with leukopenia[11] and chest pain.  On December 7, 2005, Dr. Bele also assessed that Plaintiff suffered from chronic joint pain, chronic fatigue, and migraines.

Plaintiff also submitted medical records to the Appeals Counsel after the ALJ issued his decision. These records include a report from a neurologist, Dr. Gregory Taylor.

---

[9] Arthralgia is "pain in a joint." Oxford English Dictionary (2d ed. 1989).

[10] Livedo reticularis is a vascular condition resulting in discoloration of the skin, usually in the the legs.  Mayo Clinic.com, http://www.mayoclinic.com/health/livedo-reticularis/AN01622 (last visited Sept. 5, 2008).

[11] Leukopenia is "any situation in which the total number of leukocytes in the circulating blood is less than normal, the lower limit of which is generally regarded as 4000-5000/ mm$^3$" Webmd, Steadman's Medical Dictionary, http://dictionary. webmd.com/ (last visited July 23, 2008).

Plaintiff began seeing him on February 10, 2006, and he provided a report on September 6, 2006, which diagnosed plaintiff with headaches and opined that plaintiff had significant work restrictions. In the section of the doctor's report which asked for medical findings in support of the work capacity evaluation, Dr. Taylor wrote in "pain", and listed no objective or diagnostic tests.

*2. Vocational Assessments*

Four physicians considered plaintiff's ability to work. Dr. Ralph Alvarez examined plaintiff at the request of the Commissioner. He assessed that plaintiff had mild to moderate restrictions for walking, lifting, squatting and kneeling, and that she should avoid smoke, dust, and known respiratory irritants due to a history of asthma.

State agency medical consultant, Dr. Richard Finley, reviewed plaintiff's medical records and agreed with Dr. Alvarez that plaintiff should avoid respiratory irritants, and assessed that plaintiff could frequently lift and carry ten pounds, could occasionally lift and carry twenty pounds, and could stand, sit, and walk for six hours each in an eight hour work day.

Plaintiff's physician, Dr. Ampil, reported to the Commissioner that plaintiff could lift ten pounds occasionally, could stand and walk for less than two hours in an eight-hour work day, could sit for up to six hours a day, and could push and pull up to ten pounds. At the request of the Social Security Administration, he later clarified his findings stating that the sitting limitation was due to a contusion of the coccyx, which was a product of an automobile accident, and that this limitation would likely be short-lived.

Finally, Dr. Taylor assessed Plaintiff's ability to work, finding that plaintiff could sit for one to two hours per day, could stand or walk for less than one hour per day, and could

6

use her hands to grasp, turn, twist, feel, and for fine manipulation but not for overhead reaching or for pushing/pulling arm controls.

## II. Procedural History

After the Appeals Council denied Plaintiff's request for review of the ALJ's decision on August 30, 2007, Plaintiff filed a complaint pursuant to 42 U.S.C. § 405(g) on October 15, 2007, requesting that this court review the decision of the Commissioner denying Plaintiff's application for SSI benefits. On April 9, 2008, Plaintiff then moved for a Judgment on the Pleadings under Federal Rules of Civil Procedure Rule 12(c). Defendant then filed a cross-motion for Judgment on the Pleadings pursuant to Federal Rules of Civil Procedure Rule 12(c).

## III. Discussion

An individual may request judicial review by the District Court in the judicial district in which he or she resides of a final decision by the Commissioner of Social Security. 42 U.S.C. § 405(g). The district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. The Social Security Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Id. The court does not engage in a de novo determination of whether or not the claimant is disabled, Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner. See 42 U.S.C. § 405(g); see, e.g., Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004). If the Court finds there is substantial evidence for the determination, the Commissioner's decision must be upheld, even if there is substantial evidence for the Plaintiff's position as well. See Schauer v. Schweiker, 675

F.2d 55, 57 (2d Cir. 7982).  Evidence supporting a decision is "substantial" where reasonable minds might accept the evidence as adequate.  <u>Pollard</u>, 377 F.3d at 188 (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 407 (1971)).  The substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts.  <u>Rodriguez v. Califano</u>, 431 F.Supp. 421, 423 (S.D.N.Y. 1977).

The act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §423(d)(1)(A).  A claimant is disabled under the act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step procedure for evaluating disability claims.  See 42 U.S.C. § 423(d)(4)(A) (ordering Commissioner to promulgate regulations prescribing the criteria for determining disability); 20 C.F.R. § 404.1520. The Second Circuit Court of Appeals has interpreted this five-step procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's

8

> severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa, 168 F.3d at 77.

The burden rests on the claimant through the first four steps. The claimant must prove that she is unable to perform prior work activity. Once claimant proves that her severe impairment prevents her from performing her past work, the burden shifts to the Commissioner at the fifth stage of the analysis. Using the residual functional capacity assessment performed at step four, the Social Security Administration must establish at the fifth step that the claimant can perform alternative substantial, gainful work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(e); Snipe v. Barnhart, No. 05 Civ. 10472, 2006 WL 2390277, at *9 (S.D.N.Y. Aug. 21, 2006) ("The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work, and . . . at step five to determine whether the claimant can do any work.")

A Rule 12(c) motion may be granted "where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988) (citations omitted).

***The ALJ Erred in His Application of Step 3 of the Disability Inquiry.***

The ALJ began with the first step: whether the claimant has engaged in substantial gainful activity at any time relevant to the decision, pursuant to 20 C.F.R. § 416.920(b). Because there was no record of the plaintiff having ever engaged in substantial gainful activity, the disability analysis proceeded to step two where the ALJ considered whether the plaintiff suffered from a severe impairment. An impairment is severe if it "significantly

9

limits an individual's ability to perform basic work activities." 20 C.F.R. § 416.921. The ALJ found that Plaintiff suffered from two severe impairments, cyclic neutropenia and asthma.[12]

The ALJ then moved to the third step in the sequential evaluation where he considered whether Plaintiff's severe impairments, cyclic neutropenia and asthma, met, or equaled in severity, the Listing of Impairments set forth at 20 C.F.R., Part 404, Subpart P, App. 1. The ALJ held that "[s]pecifically, there are no findings to warrant application of any listings as contained under section 7.00 which deals with hematological disorders, including listing 7.02 pertaining to anemia.[13] Similarly, there is no evidence of asthma attacks requiring physician intervention at the frequency set forth in medical listing 3.03B. [14]" (Pl.'s Comp. App. A). The ALJ's finding that Plaintiff's asthma did not meet the medical listing of 3.03B is supported by substantial evidence as there are no medical records of plaintiff suffering an asthma attack requiring physician intervention at any time since her eighteenth birthday.

However, the ALJ erred with regard to his assessment of plaintiff's cyclic neutropenia. The ALJ stated that none of the hematological disorders under section 7.00 were applicable to plaintiff's condition, and mentioned, in a cursory fashion, only the anemia listing. This assessment was in error.

---

[12] Plaintiff asserts that the ALJ erred in excluding her frequent sinus infections, depression, kyphosis, and fibromyalgia at this step. I find this argument to be without merit. An "impairment must result form anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. Because plaintiff's allegations of sinus infections, depression, kyphosis, and fibromyalgia are not medically demonstrated through accepted diagnostic techniques, the ALJ did not err in holding that these ailments were "non-severe". 20 C.F.R. § 416.908.

[13] 20 C.F.R. Part 404, Subpart P, Appendix 1, § 7.02 requires: "Chronic Anemia (hematocrit persisting at 30 percent or less due to any cause). With: (A) Requirement of one or more blood transfusions on an average of at least once every 2 months; or, (B) Evaluation of the resulting impairment under criteria for the affected body system."

[14] 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.03B defines asthma attacks as: "in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks."

Section 7.16 of the listings pertains to "Chronic Granulocytopenia (due to any cause)". The listing requires "[a]bsolute neutrophil counts repeatedly below 1,000 cells/cubic millimeter" and "[d]ocumented recurrent systemic bacterial infections occurring at least 3 times during the 5 months prior to adjudication". The definition of chronic neutropenia taken from The Merck Manual and set forth in full in footnote 1 supra states that chronic neutropenia is also referred to as granulocytopenia. Thus, section 7.16 of the listings is squarely on point in this case. The ALJ did not mention this listing, let alone examine the requirements against the evidence to determine whether the plaintiff met the criteria. This failure caused an error requiring remand. See Burnett v. Comm'r Soc. Sec. Admin., 220 F.3d 112, 119-20 (3d Cir. 2000) (remanding case where ALJ made conclusory statements that plaintiff failed to meet any listing without identifying relevant listing impairments and examining evidence in light of the listing). See also Carolyn A. Kubitschek, Social Security Disability: Law and Procedure in Federal Court, § 3:22, 231-32 (Thomson West 2008) ("An ALJ has the obligation to conduct a full and fair inquiry into each claim. Because the Listings are so important—in some cases they are a 'make or break' determination of disability—courts have held that when there is a possibility that a claimant meets one of the Listings, the ALJ must consider that Listing specifically and develop the record fully and fairly as to all of the component parts of that Listing. . . . The ALJ has the responsibility for identifying the appropriate Listing for the claimant's impairment.").

The record before me is insufficient to permit the Court to make the required determination. Despite the medical records of the numerous physicians that plaintiff consulted, and the voluminous physicians' notes, blood tests results and other medical records, the record does not reveal plaintiff's absolute neutrophil count, nor whether it was consistently below 1,000

11

cells/cubic millimeter[15], or whether plaintiff suffered from systemic bacterial infections in the 5 months before the hearing. The ALJ did not attempt to elicit at the hearing from the plaintiff, or try to discern from the medical records provided, the severity of plaintiff's neutropenia and the extent to which the risk of infection affects her ability to find employment. On remand, the ALJ is directed to engage in this inquiry and determine whether and to what extent plaintiff's neutropenia, and particularly the risk of infection that results from this affliction, causes functional limitations on her ability to find work in accordance with the chronic granulocytopenia. If it is not possible for the ALJ to make the assessments on the basis of the record alone, the ALJ should enlarge the record to allow him to make the appropriate findings.

## *IV. Conclusion*

For the reasons discussed above, the case is remanded to the Commissioner for the limited purpose of considering whether plaintiff's chronic neutropenia meets or materially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

SO ORDERED.

Dated: New York, New York
September ___, 2008

ALVIN K. HELLERSTEIN
United States District Judge

---

[15] On August 1, 2008, I issued an Order directing plaintiff to submit medical records conforming to the definition of Merck definition of Neutropenia by August 22, 2008. Plaintiff failed to comply with that order. Because a proper record was not developed regarding either the neutrophil level or whether plaintiff had experienced frequent infections, the second component of the granulocytopenia listing, I decline to draw an adverse inference from the plaintiff's failure to comply with my order, and direct the ALJ to determine whether medical records reflecting the presence or absence of neutropenia exist on remand.

12